IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BRENDA RIVERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:17-cv-0158-TMP |
| | ) | |
| COREY LENARD; CITY OF | ) | |
| HOMEWOOD, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This cause is before the court on the motion for summary judgment filed January 26, 2018, by the defendants, Corey Lenard, a police officer employed by the City of Homewood, and the City of Homewood itself.   (Doc. 47).   Defendants seek dismissal of all of plaintiff's claims.   This matter has been fully briefed.   The court has considered the pleadings, evidence, and arguments set forth by the parties. The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c).

## Introduction

This case involves the frustrating yet enduring conflict between the need for police to make difficult decisions during the course of law enforcement and the

essential human right of law-abiding citizens to retain their dignity as free people. A victim's report of a theft rightly demanded some action by police, which led to the physical and emotional embarrassment of an indisputably innocent woman. All that was purchased by the assault on her dignity was an increasing perception of the law's inability to protect innocent people, whether they be theft victims or the innocent targets of police investigation.

Plaintiff Brenda Rivers brought this action pursuant to 42 U.S.C. § 1983 and Alabama state law. (Doc. 1). She has twice amended her complaint. (Docs. 5, 23). She contends that Corey Lenard, a police officer employed at the relevant time by the City of Homewood ("the City" or "Homewood"), subjected her to an unreasonable search and seizure in violation of the Fourth Amendment to the United States Constitution while he was investigating a report of a stolen wallet on the evening of December 1, 2016. (Doc. 23, pp. 3-4 (Count One)). She further asserts that Lenard used excessive force in restraining her during her shopping trip to the Wal-Mart store in Homewood, Alabama. (Doc. 23, pp. 5-6 (Count Two)). She also alleges that the defendants committed a false arrest and false imprisonment by taking her down to the floor of the Wal-Mart and handcuffing her without probable cause. (Doc. 23, pp. 6-8 (Count Three)).[1] These three federal

---

[1] Count One is labeled as a § 1983 claim of illegal search and seizure, while Count Three is labeled as a § 1983 claim of false arrest/false imprisonment. The court reads Count One

claims are asserted pursuant to 42 U.S.C. § 1983. Ms. Rivers further asserts claims arising under Alabama state law, including false arrest and false imprisonment in violation of Alabama Code § 6-5-170 (Count Four) and negligent assault and battery in the use of excessive force to compel her detention (Count Five). (Doc. 23, pp. 7-10). Finally, she asserts that the City is vicariously liable[2] for the actions taken by defendant Lenard. (Doc. 23, pp. 10-11 (Count Six)).

In their motion for summary judgment, the defendants assert that Rivers has not set forth a viable claim under Section 1983 against the City because the plaintiff has failed to show a causal link between any City policy, custom, or practice and the alleged unlawful conduct of Lenard. In her response to the motion for summary judgment, the plaintiff concedes that all claims against the City of Homewood are due to be dismissed. (Doc. 50, p. 7). She further has stated that she abandons her claim in Count One asserting an unlawful search. (Id.) Accordingly, the court finds that all claims against the defendant City are

to allege a claim that the defendant illegally searched her purse and Count Three to allege a claim of an illegal seizure of her person in the form of an arrest or detention.

[2]     Count Six is subtitled "Respondeat Superior/Vicarious Liability," and it alleges that Officer Lenard was acting within the line and scope of his employment with the City, resulting in the City being "vicariously liable to Plaintiff for the negligent, reckless, or wanton conduct of its employee." Unlike the other counts of the Amended Complaint, there is no explicit reference in Count Six to whether it is grounded on state law or federal law. However, as noted below, the plaintiff has abandoned her claims against the City.

due to be dismissed, along with any claim asserting that she was subjected to an unlawful search under state or federal law. The claims remaining in the case, as plaintiff has conceded, are: (1) a federal-law claim of false imprisonment against Lenard; (2) a federal-law claim of excessive force against Lenard; and (3) a state-law claim of false imprisonment against Lenard.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23.

There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson,

477 U.S. at 255.   The non-movant need not be given the benefit of every inference but only of every reasonable inference.   <u>Brown v. City of Clewiston</u>, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).


<u>Summary Judgment Facts</u>

Applying the standards governing summary adjudication to the evidence in the record, the following facts are undisputed, or, if disputed, are viewed in the light most favorable to the non-moving plaintiff.

Mrs. Rivers' claims arise from the report of a stolen wallet at the Homewood Wal-Mart Superstore ("the store") on December 1, 2016.   Defendant Lenard was a police officer working for the City of Homewood.   He responded to a call from the police dispatcher, which reported that a wallet was taken by an "older black female" wearing a "black skirt or dress."   (Audio filed conventionally as Defendants' Ex. A, Doc. 47-2).[3]   Lenard entered the store and spoke with the victim, who told him the person who stole her wallet was wearing "dark underclothing" that may have been a skirt or dress and a black coat.   He does not remember any other description given

_____

[3]      Although the plaintiff asserts that the victim, Salima Jan, stated that the person who took her wallet was an "African American lady in her 50s" and was "[w]earing [a] black vest with white long sleeves," who had "short blonde hair that was sticking up," that information was contained in the written statement obtained after Mrs. Rivers' encounter with Lenard. (Doc. 50-2).   There is no evidence that these details of the description were known to Lenard before he encountered the plaintiff.

by the victim.   Apparently, he did not ask about height, weight, identifying traits, hair color, or hair style.   In a written statement given *after* the incident at issue, the victim reported that the person who took the wallet was wearing a black vest with white sleeves and had blonde hair that was sticking up.

Lenard first approached an African American woman, not the plaintiff, requesting to search her purse.   She consented, but Lenard did not find the stolen wallet.   He continued walking through the store. As he approached Mrs. Rivers, she and her husband were pushing a shopping cart behind the first woman he approached, and that woman commented loudly enough for Mrs. Rivers to hear, "Oh my God, here he comes again.   I can't believe he's going to follow me through whole store."   (Doc. 50-8, Plaintiff's Depo, p. 69).   But instead of approaching the woman, Lenard approached Mrs. Rivers.

Officer Lenard first appears on the surveillance video at 8:21:37 p.m. on December 1, 2016.   Mrs. Rivers and her husband were shopping at the store when Mrs. Rivers was approached by Lenard at 8:21:47 p.m.[4]   Mrs. Rivers, an African American, was at the time about 57 years old and was wearing a black jacket and dark pants, which appear in the store surveillance video to be burgundy or purple.

---

[4]   The times used in this narrative are taken from the surveillance video provided by both parties.   The plaintiff's brief refers to different times or markings, but those do not appear on the disks provided to the court.   For example, the plaintiff's brief refers to a key event occurring at 7:50 p.m., but none of the videos provided to the court contain that time marker.

She was not wearing a "skirt or dress." Her medium-length hair was dark brown or black. Lenard was wearing a police uniform when he approached Mrs. Rivers, but he did not verbally identify himself as a police officer. Lenard asked her, "Do you have something in your purse that does not belong to you?" She did not answer, and at 8:23:21 p.m., she moved her shopping cart down the aisle, away from Lenard, towards the back of the store. Lenard asked if he could search her purse and she said "no." At 8:23:48 p.m., Lenard stopped Mrs. Rivers again a few aisles from where the first encounter occurred, and he radioed Officer Jason Suggs, who was at the front of the store with the victim, asking Suggs to bring the victim to his location. Within seven seconds, at 8:23:55 p.m., Mrs. Rivers turned and moved away from Lenard toward her husband. Seconds later, at 8:24:00 p.m., Lenard reached for Mrs. Rivers' arm, and she pulled her arm away in "self-defense." She continued to move away from Lenard, but remained within a few feet of where he had grabbed at her.[5]

---

[5] Officer Lenard contends that he instructed Mrs. Rivers to remain where she was until the victim could be brought from the front of the store to determine whether Mrs. Rivers was the person who committed the theft. He argues that Mrs. Rivers committed the offense of "failure to comply" under a City of Homewood ordinance when she moved away from him despite his instruction. Viewing the evidence favorably to the non-moving party, however, Mrs. Evans testified that she did not remember any such instruction by Officer Lenard. (Plaintiff's Depo., Defendant's Ex. A, Doc. 47-3, p. 11). For purposes of this motion, the court must take as true that no such instruction was given.

Officer Suggs joined Lenard at 8:24:05 p.m. in the aisle where Lenard was trying to question or search Mrs. Rivers. Officer Lenard was struggling with Mrs. Rivers and her husband. By 8:24:45 p.m., the victim can be seen on the surveillance video watching the struggle from a few feet away, and at 8:24:50 p.m., the victim told Suggs that Mrs. Rivers was not the woman who stole her wallet. Six seconds later, at 8:24:56 p.m., Officer Suggs appears to tell Officer Lenard that the victim said that Mrs. Rivers was not the suspect.[6] Lenard asserts that he did not hear Suggs' statement. An onlooker, Kayatta Evans, who can be seen in the surveillance video a few feet from the struggle, also told Lenard that the victim said that Mrs. Rivers was not the person who stole the wallet. (Affi. of Evans, Plaintiff's Ex. C, Doc. 50-4).[7]

---

[6] Officer Suggs confirmed in his deposition testimony that he told Officer Lenard what the victim had said. Officer Lenard testified that he did not hear it.

[7] The defendant has moved to strike the Evans affidavit on grounds that Evans was not identified as a witness in initial disclosures or discovery, and that her statement is inadmissible hearsay. (Doc. 53). The motion (titled as an objection) is DENIED in part and GRANTED in part. The defendant admits he knew that "Evans was a potential witness" who had "given a statement to the Homewood Police after the incident." He was not surprised by Evans' appearance as a witness, and therefore, defendant's assertion that he was denied an opportunity to depose or cross-examine Evans is without merit, and the motion on grounds of nondisclosure is DENIED. To the extent that the affidavit contains hearsay in the form of what a "bald officer" told her at the scene and her conclusion about Lenard's mental state—that Lenard "ignored" Suggs' statement—the motion is GRANTED, and those statements are STRICKEN. However, the statement by Evans to Lenard about what the victim said is not hearsay because it is not offered to prove the truth of the assertion that Mrs. Rivers was not the thief. Rather, it is offered to prove what information Lenard possessed at the time he continued to struggle with her—whether true or not. It is the fact of the statement, not its content, that is important. In the same document, the defendants object to the plaintiff's offer of the testimony by Michael Richards as an expert witness,

Lenard and Mrs. Rivers continued to struggle, as the officer held Mrs. Rivers' arm behind her back and she attempted to move away or pull out of his grasp. Mr. Rivers approached Lenard and appeared to argue with him. The struggle continued for about two minutes, and then at 8:27:45 p.m., Lenard threw Mrs. Rivers to the floor in a maneuver he described as a "takedown." At this, Mr. Rivers became more agitated and tried to intervene. Officer Suggs, who had been watching the struggle, unholstered his Taser and pointed it at Mr. Rivers. Mrs. Rivers remained face-down on the floor while Lenard forcibly handcuffed her arms behind her back.

A crowd of shoppers gathered near the aisle where Mrs. Rivers was on the floor, shouting at Lenard to let her go. One onlooker recorded the incident on her cell phone and posted it to You-Tube.[8] In the audio from this recording, Lenard can be heard asking Mrs. Rivers to get up and walk, but she refused, telling him that she wasn't going to jail. Lenard told her that she was being arrested for "failure to comply." Ms. Evans, who appears to be an African American of about the same

---

who testified that a reasonable officer, upon being told that the suspect he had detained had been cleared by the victim, should immediately release the suspect and apologize, on grounds that his opinion is an "impermissible legal conclusion." The court has resolved the motion for summary judgment without requiring reference to the expert testimony; accordingly, the objection as to the expert testimony, which is deemed a motion to strike, is DENIED without prejudice to raising the issue at trial.

[8]     The video taken by a shopper is provided as defendants' Exhibit E. Although it contains audio, the video does not begin until after the "takedown" that resulted in Ms. Rivers lying on the floor in handcuffs. It provides little evidence regarding why the "takedown" occurred.

age as Mrs. Rivers, told the crowd of onlookers and Mrs. Rivers that the officer had also stopped her and had searched her purse. Ms. Evans was wearing black pants, a red print shirt, and a black sweater.[9] At 8:29:20 p.m., the victim reappeared in the aisle where Mrs. Rivers was handcuffed on the floor, and apparently told the officers gathered around that Mrs. Rivers was not the person who stole the wallet.

After Mrs. Rivers lay on the floor for several minutes, at about 8:32, another officer arrived and talked with the crowd of onlookers and with Mr. Rivers. On the You-Tube video, Ms. Evans can be heard repeatedly stating that the victim had said the thief was not Mrs. Rivers, and Mrs. Rivers and Mr. Rivers also told police that the victim had said that Mrs. Rivers was not the person who stole the wallet.

Officer Lenard asked for the victim to come and tell him whether Mrs. Rivers was the person who stole the wallet. At 8:34, a fourth officer arrived and, within the next couple of minutes, two more officers arrived in the aisle. The final officer on the scene knelt down to talk with Mrs. Rivers. A chair was brought to the aisle, and Mrs. Rivers was raised up onto her knees. Eventually, at 8:51 p.m., the handcuffs were removed and Mrs. Rivers stood up. She and Mr. Rivers remained in the aisle with the onlooker who appears to be Kayatta Evans and the last officer to

_____

[9] It appears to the court from the surveillance video that the woman stopped by Lenard whose purse had been searched was Kayatta Evans, but neither of the briefs makes that fact entirely clear.

arrive on the scene, until they all departed from the view of the surveillance camera at 9:20 p.m.   No charges were ever filed against Mrs. Rivers.

Mrs. Rivers went to the emergency room complaining that she had been hurt in the takedown.   She had bruises to her ribs.   She also visited an orthopedist, and missed a couple of days of work because of injuries from the incident.   She took pain medications for about three weeks but did not suffer any permanent injuries from the takedown.

At the time of these events, the City had adopted the following ordinance:

> Any person who shall violate, or fail, neglect or refuse to comply with any lawful order of any lawful officer of the city made in pursuance of and under such officer's authority as such officer, or who shall violate, or shall fail, neglect or refuse to comply with any of the codes, rules, regulations or laws adopted by this Code, shall be guilty of an offense; provided, however, the provisions of this section shall not apply to violations of official duty imposed by this Code upon officers or employees of the city as such, unless the provision imposing the duty also expressly makes the violation thereof unlawful or punishable.

The Code of Ordinances, City of Homewood, Alabama, Chap. 1, § 1-9.[10]  This ordinance appears to be the basis of Officer Lenard's assertion that the plaintiff could be arrested for "failure to comply."[11]

---

[10]     The penalty for "offenses" in violation of The Code of Ordinances is a fine of not more than $500.00 and imprisonment for not more than six (6) months.   *The Code of Ordinances, City of Homewood, Alabama*, Chap. 1, § 1-8(a).

# **<u>DISCUSSION</u>**

The defendants argue that the claims brought against Lenard, who is being sued in his individual capacity on the federal claims of excessive force and false imprisonment, are due to be dismissed because he is entitled to qualified immunity on the federal § 1983 claims.    Plaintiff asserts that he is not entitled to immunity because it was not objectively reasonable to detain Mrs. Rivers, because her conduct was not an illegal failure to comply, and because it was not objectively reasonable to detain her once he had been told that she was not the perpetrator of the theft. Lenard also asserts that he is entitled to state agent immunity for the state-law claim of false imprisonment.    The plaintiff argues that the state-law immunity is unavailable to Lenard because he acted in bad faith and fraudulently when he claimed that he was detaining her for failure to comply.

---

[11]      The court observes that the State Class A misdemeanor for Obstructing Governmental Operations, Ala. Code § 13A-10-2 (1975), does not seem to apply to the undisputed facts.   First, it explicitly does not apply to interference with the making of an arrest.   *See* Ala. Code § 13A-10-2(b).    Second, Officer Lenard contends that Mrs. Rivers failed to comply with his order to remain where she was while he investigated the reported theft.   To commit the offense of obstructing governmental operations, the perpetrator must use "intimidation, physical force or interference or by any other independently unlawful act" to intentionally prevent a "public servant from performing a governmental function."   Ala. Code § 13A-10-2(a)(2).   In this case, Officer Lenard asserts that, after Mrs. Rivers declined to allow him to look in her purse, he instructed her to remain where she was until the victim of the theft could be brought to her to identify whether Mrs. Rivers was the person who committed the theft.    Instead, she turned and began to walk away. For purposes of the state statute, doing so was not "intimidation," "physical force or interference," or an "independently unlawful act."

## A.   Federal Claims and Qualified Immunity

Plaintiff's claims of excessive force and false imprisonment arise under 42 U.S.C. § 1983, which provides a right of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" when the deprivation is caused by anyone acting under color of law.   Id.   Essentially, Mrs. Rivers asserts that Lenard grabbed her, pushed her to the ground, handcuffed her, and detained her there without probable cause.   The defendant asserts that he was authorized to detain her for long enough to determine whether she was involved in the wallet theft.

Under federal law, it is well settled that qualified immunity protects government officials performing discretionary functions from civil suit, and from liability, where their conduct does not violate "clearly established statutory or constitutional rights."   Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).   The shield of qualified immunity has been expanded to include acts that may not involve the exercise of "actual discretion," and can include acts that may be ministerial but are "job-related functions" and carried out through means that are within the official's authority to utilize. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004), quoting Hill v. DeKalb

Regional Youth Detention Center, 40 F.3d 1176, 1185 n. 17 (11th Cir. 1994). Furthermore, it is the general rule that qualified immunity will protect government actors from liability, and only in "exceptional cases" will the immunity be unavailable as a shield. Harris v. Board of Education of Atlanta, 105 F.3d 591, 595 (11th Cir. 1997). Even so, qualified immunity does not apply in those instances where the case law establishes a "bright line" in such a "concrete and factually defined context" to make it obvious to all reasonable government actors, in the defendant's place, that the actions violate federal law. Scarbrough v. Myles, 245 F.3d 1299, 1301 (11th Cir. 2001).

The initial burden of demonstrating that the public official was acting within the scope of his position lies with the defendant asserting that defense. Holloman, 370 F.3d at 1265-66. The test is not whether the defendant had the authority to effectuate an illegal act, but whether his job entailed engaging in the act in general. See id. Once the defendant has met that burden, the burden of proof shifts to the plaintiff to show that the defendant is not entitled to qualified immunity. Id. To prevail against an assertion of qualified immunity, the plaintiff must demonstrate that: "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Id. at 1264, citing Wilson v. Layne, 526 U.S. 603, 609, 199 S. Ct. 1692, 1697, 143 L. Ed. 2d 818 (1999).

Qualified immunity shields a government official from liability for civil damages in tort actions if the official was performing a discretionary duty, unless the conduct of the official "violates a clearly established statutory or constitutional right." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). There is no dispute that Lenard was engaged in a discretionary duty while he was investigating the theft of a wallet at the Wal-Mart store. Thus the plaintiff has the burden of showing that Lenard is not entitled to qualified immunity.

To resolve the issue, the court undertakes a two-part inquiry, determining whether Lenard's conduct violated a constitutional right and whether that right was clearly established at the time of the incident. Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). On summary judgment, the facts as to whether the defendant violated a constitutional right are viewed favorably to the non-moving plaintiff. In this case, Mrs. Rivers asserts that Lenard engaged in two violations of her constitutional rights. She first contends that she was subjected to excessive force by being slammed to the ground and handcuffed; she further asserts that being detained on the floor of the Wal-Mart was a false imprisonment in violation of her rights under the Fourth Amendment.

1. <u>Terry</u> Stop

The encounter between the plaintiff and Officer Lenard seems to involve two different types of detention under the Fourth Amendment: an investigative <u>Terry</u> stop and a full-blown arrest. The standard for whether Lenard's actions conformed to the Fourth Amendment depends upon whether he was conducting an investigative stop or an arrest, and at what points in time during the encounter these issues arose. Under <u>Terry v. Ohio</u>, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), a police officer is permitted under the Fourth Amendment to stop and briefly detain an individual as part of an investigation based upon a reasonable suspicion of criminal activity. Such brief, investigative detentions permitted by <u>Terry</u> have come to be known as "<u>Terry</u> stops."

An officer may conduct a <u>Terry</u> stop if, under the totality of the circumstances, he has an objectively reasonable suspicion that the person stopped has engaged in, or is about to engage in, a crime. <u>United States v. Sokolow</u>, 490 U.S. 1, 7-8, 109 S. Ct. 1581, 1585–86, 104 L. Ed. 2d 1 (1989), <u>United States v. Powell</u>, 222 F.3d 913, 917 (11th Cir. 2000). "The 'reasonable suspicion' must be more than an 'inchoate and unparticularized suspicion or hunch.'" <u>Powell</u>, 222 F.3d at 917 (quoting <u>Terry</u>, 392 U.S. at 27). "'While "reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably

less than a preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop.'" Jackson v. Sauls, 206 F.3d 1156, 1165 (11th Cir. 2000) (quoting Illinois v. Wardlow, 528 U.S. 119, 123, 120 S. Ct. 673, 675–76, 145 L. Ed. 2d 570 (2000)).   See also United States v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004).   It has been noted that reasonable suspicion is "not readily, or even usefully, reduced to a neat set of legal rules." Sokolow, 490 U.S. at 7.   Moreover, "the reasonable suspicion determination must be based on commonsense judgments and inferences about human behavior." Wardlow, 528 U.S. at 120.   However, "[b]ased upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the *particular* person stopped of criminal activity."   United States v. Cortez, 449 U.S. 411, 417–18, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621 (1981) (emphasis added).

In United States v. Webster, the Eleventh Circuit Court of Appeals examined whether a "BOLO," or "be on the lookout," description of a vehicle that had been involved in a shooting earlier in the day was "too vague to provide a minimal, objective justification" for a Terry stop.   314 F. App'x 226, 228 (11th Cir. 2008). The defendant argued that too many vehicles could have matched the description the officer used of a "dark-colored vehicle, unknown make and model" with writing on the rear window "something to the effect of 'Down South Customs.'"   314 F. App'x

at 229.   In <u>Webster</u>, the officer pulled over the driver of a blue Pontiac Grand Am with "Down and Dirty Customs" written on the back window.   314 F. App'x at 227. Although an updated BOLO revealed that the Pontiac did not meet the description, the court found that the officer had an "objective justification to establish reasonable suspicion."   314 F. App'x at 229.   The court noted:

> We are convinced that such a description sufficiently narrows the field of suspected vehicles so as to support reasonable suspicion for a *Terry* stop.   Webster's attempt to distinguish the BOLO description of "Down South Customs" from his vehicle's "Down and Dirty Customs" is unpersuasive, and we conclude that the BOLO description received by Officer Manora was sufficiently similar to Webster's car to justify the *Terry* stop.

<u>United States v. Webster</u>, 314 F. App'x 226, 229 (11th Cir. 2008).   Similarly, a <u>Terry</u> stop of a vehicle that was spotted less than a mile from the scene of a shooting was justified where the vehicle matched the make, model, and license number of the vehicle described to police.   <u>United States v. Benitez-Macedo</u>, 129 F. App'x 506, 512 (11th Cir. 2005).

<u>Terry</u> stop jurisprudence often involves the description of vehicles, but <u>Terry</u> and some of its progeny involve whether the description of an individual's appearance is sufficiently detailed to justify a detention.   The Eleventh Circuit Court of Appeals upheld a <u>Terry</u> stop of a man who matched "the detailed

description, provided by the United States Customs office, of a fugitive from justice." United States v. Kapperman, 764 F.2d 786, 791 (11th Cir. 1985). The description included height, weight, hair color, facial hair description, and a description of the style of clothing the suspect liked to wear. 764 F.2d at 789. In United States v. Griffin, the court upheld a Terry stop that involved a theft of clothing at a mall where the security guard pointed to a group of six or eight people and told the officer that the thief was "the black man in the green jacket and jeans." 696 F.3d 1354, 1358 (11th Cir. 2012). A suspect's description as "black, heavyset, in his 30s, located in the Yellow Meat Market, wearing a white shirt and black cargo shorts, with a lowboy haircut and tattoos," gave officers "enough articulable facts" to justify an investigatory stop in United States v. Wright, 712 F. App'x 868, 870-71 (11th Cir. 2017). Detention has been authorized where a suspect "exactly matched the physical description of [the suspected drug dealer]" and he "recited the code phrase" that had been given to the undercover police officer. United States v. Diaz-Lizaraza, 981 F.2d 1216, 1219 (11th Cir. 1993). Other circuit courts of appeals have also required that the description of a person suspected of a crime must contain specific details and cannot be "too vague." See, e.g., Dorsey v. Barber, 517 F.3d 389, 391 (6th Cir. 2008) (holding that a BOLO that described two African-American men, one with cornrows, one wearing a blue jersey and one

wearing a white jersey was not too vague, where the men detained not only fit that description but were the only African Americans seen in a large crowd); Washington v. Lambert, 98 F.3d 1181, 1190 (9th Cir. 1996) (stating in *dicta* that descriptions that are "exceeding vague and general" would not support a Terry stop).   The Second Circuit Court of Appeals has noted that "Terry explicitly recognized that specificity was essential in part because according the police unfettered discretion to stop and frisk could lead to harassment of minority groups and severely exacerbate police-community tensions."   United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000) (internal quotation marks and alterations omitted).

However, it is well established that if a police officer approaches a person "without reasonable suspicion or probable cause" the person "has a right to ignore the police and go about his business."   Wardlow, 120 S. Ct. at 676 (citing Florida v. Royer, 460 U.S. 491, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983).   "A refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."   Id. (quoting Florida v. Bostick, 501 U.S 429, 437, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991).   Even flight from an officer has been recognized as, in some circumstances, "neither 'aberrant' nor 'abnormal.'" Justice Stevens wrote:

Among some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence. For such a person, unprovoked flight is neither "aberrant" nor "abnormal." Moreover, these concerns and fears are known to the police officers themselves, and are validated by law enforcement investigations into their own practices. Accordingly, the evidence supporting the reasonableness of these beliefs is too pervasive to be dismissed as random or rare, and too persuasive to be disparaged as inconclusive or insufficient.

Illinois v. Wardlow, 528 U.S. 119, 132-34, 120 S. Ct. 673, 680-81, 145 L. Ed. 2d 570

(2000) (Stevens J., concurring in part and dissenting in part).

The Supreme Court has summarized the constitutional parameters of the

Terry stop as follows:

Beginning with *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), the Court has recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further. *Delgado, supra*, at 216, 104 S. Ct. 1758; *United States v. Brignoni‑Ponce*, 422 U.S. 873, 881, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975). To ensure that the resulting seizure is constitutionally reasonable, a *Terry* stop must be limited. The officer's action must be "'justified at its inception, and ... reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Sharpe*, 470 U.S. 675, 682, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) (quoting *Terry, supra*, at 20, 88 S. Ct. 1868). For example, the seizure cannot continue for an excessive period of time, *see United States v. Place*, 462 U.S. 696, 709, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983), or resemble a traditional arrest, *see*

*Dunaway v. New York*, 442 U.S. 200, 212, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979).

Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty., 542 U.S. 177, 185-6, 124 S. Ct. 2451, 2458, 159 L. Ed. 2d 292 (2004)

In this case, the only description available to Lenard, even crediting his statement that he talked to the victim before approaching Mrs. Rivers, was that of an "older" African-American female wearing a black coat and a black skirt or dress, or "dark underclothing." He had not obtained any description of her height, weight, or hair color. There is no assertion (and video evidence would clearly dispute) that Mrs. Rivers was the only, or even one of a few, older African-American females shopping in the store that evening. She plainly was not wearing a skirt or dress, as described by the victim. Lenard did not observe any activity—such as Mrs. Rivers running toward the exit, or appearing nervous or agitated—that would give him any objective, articulable reason to suspect that Mrs. Rivers had been engaged in a crime. To the contrary, she was casually pushing a shopping cart through the store, moving in the direction of the rear of the store, away from the exit.

Had Lenard employed "commonsense judgments" or made reasonable "inferences about human behavior," as required by the Supreme Court in Wardlaw, he would have recognized that Mrs. Rivers was simply one of many older female

shoppers who were African American and who was—in December—dressed in a dark coat but not in a skirt or dress. The vague description available to Lenard at that time was woefully inadequate to support a reasonable suspicion that Mrs. Rivers—"the particular person stopped," United States v. Cortez, 449 U.S. 411, 417, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621 (1981)—was the woman who had stolen a wallet, and nothing about her behavior lawfully gave rise to suspicion that she had been engaged in any criminal activity.[12] The victim's description of the thief made no mention of a man accompanying the thief, while the surveillance video clearly depicts Mr. Rivers with his wife at all times. The victim's description said the thief was wearing a "skirt or dress," not pants. All he knew was that Mrs. Rivers was an African-American woman in a black coat. Balancing the totality of the circumstances, there simply was not enough detail in the victim's description to say that Officer Lenard had an objectively reasonable suspicion that this "particular person"—Mrs. Rivers—had engaged in crime.[13] There was no basis for making a Terry stop of her.

---

[12]   The court reiterates that Mrs. Rivers' refusal to consent to a search of her purse could not lawfully create additional suspicion of her. The defendant properly does not contend that he had probable cause to search the purse and, therefore, Mrs. Rivers had the Fourth Amendment right to decline to give consent. The invocation of her right under the Fourth Amendment cannot be used as a basis for heightened suspicion of her.

[13]   The court notes the case of Morris v. Town of Lexington Alabama, 748 F.3d 1316

Concluding that there was not a sufficient objectively reasonable suspicion for a <u>Terry</u> stop does not end the analysis for purposes of civil liability. Even if there was not a sufficiently constitutional basis for a brief investigative stop of Mrs. Rivers, Officer Lenard still is entitled to claim qualified immunity if a reasonable officer in his place could believe, even if mistakenly, that a sufficient suspicion existed for a <u>Terry</u> stop. "A law enforcement official who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity. When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." <u>Jackson v. Sauls</u>, 206 F.3d 1156, 1165–66 (11th Cir. 2000).[14] Thus, to be civilly liable in damages, it must be

_____

(11th Cir. 2014), where the court of appeals rejected the assertion that deputies had a reasonable suspicion to enter a house to investigate an allegation that horses were being abused. The court stressed that <u>Terry</u> did not supply a basis for detaining the homeowner, saying "They [the deputies] did not have reasonable suspicion of anything concerning Morris when they approached the front door of his house and knocked, for *the woman had said nothing at all indicating that Morris had done anything wrong*." <u>Id</u>. at 1324 (emphasis added). Similarly, in <u>Williamson v. Mills</u>, 65 F.3d 155, 158 (11th Cir. 1995), the court of appeals rejected qualified immunity based on arguable probable cause, saying, "What was fatally missing from Mills's knowledge, however, was a link between the suspected criminal activity and Williamson." These cases underscore the <u>Terry</u> requirement that the factual basis of the objectively reasonable suspicion must cast suspicion on the "particular" person stopped.

[14] Cited by the <u>Jackson</u> court as authority for the proposition that arguable reasonable suspicion is a basis for qualified immunity in <u>Terry</u>-stop cases are three cases, <u>Williamson v. Mills</u>, 65 F.3d 155, 157 (11th Cir.1995); <u>Swint v. The City of Wadley, Alabama</u>, 51 F.3d 988, 996 (11th Cir.1995); and <u>Post v. City of Fort Lauderdale</u>, 7 F.3d 1552, 1558 (11th Cir.1993), which all involve the question of "arguable probable cause." Arguable probable cause is conceptually a

shown that *no* reasonable police officer, knowing what Officer Lenard knew, could have believed that an objectively reasonable suspicion existed to stop Mrs. Rivers for a brief investigation. The court simply cannot say that. While not enough to form an *actual* reasonable suspicion, Officer Lenard had been informed by the victim of a theft that the thief was "an older black female wearing a black skirt or dress." A reasonable police officer could conclude that this description warranted approaching women in the store meeting that rough description to briefly investigate whether any such women were involved in the theft. While that alone is not enough to warrant a <u>Terry</u> stop, Officer Lenard cannot be subjected to civil liability in damages if there was at least an "'arguable' reasonable suspicion" to stop Mrs. Rivers, and the court concludes that that very forgiving standard is met here. Consequently, Officer Lenard is entitled to qualified immunity with respect to his initial brief investigative stop of Mrs. Rivers, requiring her to remain with him until the victim could be brought to identify or deny that she was the thief.

### 2. Arrest

After Officer Lenard approached Mrs. Rivers, the surveillance video shows that she walked away from him a short distance. He followed and grabbed her arm,

---

higher standard of evidence than "arguable reasonable suspicion," in the same way that probable cause for a Fourth Amendment search is a more rigorous standard than an objectively reasonable suspicion for <u>Terry</u> stops.

and he contends, at that point, he was trying to arrest her for the misdemeanor offense of "failure to comply" with his order to remain until the victim could come to them.   To the extent that the defendant may argue that he was executing an arrest for failure to comply after he told Mrs. Rivers to remain in place while the victim came to make an identification, a dispute of material fact precludes summary judgment on this claim.   As discussed *supra*, the facts viewed in a light most favorable to the plaintiff compel the conclusion that Lenard's order to remain in place was not made pursuant to a lawful investigatory stop, and so any failure to comply was not premised on a lawful command.   Further, Mrs. Rivers testified that she does not remember hearing any such command from Officer Lenard, suggesting that no such command was given to her.   This creates an issue of fact as to whether Mrs. Rivers failed to comply with, in the language of the Homewood ordinance, "any lawful order of any lawful officer."

For Officer Lenard, the basis of his attempt to arrest Mrs. Rivers was her walking away from him after he gave her an order to remain until the victim could be brought to make an identification. [15]   (Defendant's Brief, Doc. 47-1, p. 22). Probable cause to arrest a suspect exists when law enforcement officials have facts

---

[15]      The court is clear that there was neither probable cause nor even "arguable probable cause" to arrest Mrs. Rivers for the theft that occurred.   The only arguable basis for arresting her was for her "failure to comply" with a lawful order under the Homewood ordinance, but there is a material dispute of fact on that.

and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect has committed a crime.   United States v. Gonzalez, 969 F.2d 999, 1002 (11th Cir. 1992).   Probable cause does not require convincing evidence of guilt, but does require that the officer making the arrest relies upon "reasonably trustworthy information" that would cause a "prudent person" to believe that the suspect has committed a crime.   Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998).   For qualified immunity to protect an officer from a claim of false arrest, however, the court need only find that "arguable probable cause" existed.   Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002); Jones v. Cannon, 174 F.3d 1271, 1283 (11th Cir. 1999).    "It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." Anderson v. Creighton, 483 U.S. 635, 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). An arrest must be objectively reasonable based on the totality of the circumstances. Lee v. Ferraro, 284 F.3d at 1188, 1195 (11th Cir. 2004).   In this case, the court already has determined that the circumstances did not provide sufficient reasonable suspicion for Lenard to detain Mrs. Rivers for even a brief investigatory stop under Terry.   Consequently, his order to her to remain with him until the victim could be

brought to them cannot be regarded as a "lawful" order under the Homewood ordinance. Regardless of his entitlement to qualified immunity from damages, he had no lawful authority to stop her and, logically, he had no lawful basis for ordering her to remain in place until the victim could be brought forth. The defendant, therefore, had no probable cause to arrest her for "failure to comply."

Once again, though, Officer Lenard can be civilly liable for making an illegal arrest only if he did not have "arguable probable cause." An officer mistakenly, but reasonably, believing that he possesses probable cause to make an arrest is entitled to qualified immunity from damages. But here there is a material fact dispute essential to the resolution of the issue. Mrs. Rivers testified that she does not remember being told by Officer Lenard to remain in place, implying that no such command was given to her. Resolution of the fact question as to whether or not he commanded Mrs. Rivers to remain in place is necessary to assess whether Officer Lenard could reasonably believe he possessed probable cause. If, in fact, he told Mrs. Rivers to remain in place, he could have reasonably believed he had probable cause to arrest Mrs. Rivers for "failure to comply" when she walked away.[16]

---

[16] To be clear, even if Officer Lenard ordered Mrs. Rivers to remain in place, it would not create *actual* probable cause to make an arrest for the reason already discussed—that Officer Lenard had no lawful authority to give her that ordered because he did not have a sufficient basis to make a <u>Terry</u> stop. Rather, the materiality of this fact question is addressed to "*arguable* probable cause." If Officer Lenard, in fact, gave the command, even if it was unlawful, a reasonable police

However, if he never commanded her to remain in place, there never was any order (lawful or not) with which she failed to comply. Thus, because there is a material dispute of fact, which the court must view favorably to the plaintiff at this point, the defendant is not entitled to summary judgment based on qualified immunity on the plaintiff's Fourth Amendment claim alleging an illegal arrest or restraint, and his motion for summary judgment on this basis is due to be denied.

### 3. Excessive Force

Plaintiff also has set forth a claim for use of excessive force during the making of the arrest. Where a claim for use of excessive force arises as part of an illegal seizure prohibited by the Fourth Amendment, there is no separate claim, but merely an element of damages recoverable for the illegal arrest. Under Eleventh Circuit law, "a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." Jackson v. Sauls, 206 F.3d 1156, 1171 (11th Cir.2000) (citing Williamson v. Mills, 65 F.3d 155, 158–59 (11th Cir.1995)). While the right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to

---

officer could have believed, albeit mistakenly, that he had probable cause to arrest the plaintiff for failing to comply with it. The question is crucial to qualified immunity, not the actual unlawfulness of the arrest. It does not matter whether his mistake was one of law or one of fact or mixed law and fact. See Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009).

effect it" under <u>Graham v. Connor</u>, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871−72, 104 L. Ed. 2d 443 (1989), where an arresting officer has no right to make an arrest, he does not have the right to use *any* degree of force. A similar situation was addressed in <u>Bashir v. Rockdale County, Ga.</u>   The appellate court stated:

> This is the premise of [the plaintiff's] "excessive force" claim; but this is not what is meant by "excessive force." An excessive force claim evokes the Fourth Amendment's protection against the use of an unreasonable quantum of force (i.e., non-*de minimis* force unreasonably disproportionate to the need) in effecting an otherwise lawful arrest.   When properly stated, an excessive force claim presents a discrete constitutional violation relating to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest.   A claim like [the plaintiff's]—that the deputies used excessive force in the arrest because they lacked the right to make the arrest—is not a discrete constitutional violation; it is dependent upon and inseparable from his unlawful arrest claim. *Jackson*, 206 F.3d at 1171.   We reiterate, where an excessive force claim is predicated solely on allegations the arresting officer lacked the power to make an arrest, the excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest claim. *Id.; Williamson*, 65 F.3d at 158−59.   [The plaintiff] does not present a discrete excessive force claim and, therefore, his excessive force claim fails as a matter of law.

<u>Bashir v. Rockdale County, Ga.</u>, 445 F.3d 1323, 1331−32 (11th Cir. 2006).

In the instant case the court has concluded that the arrest of Mrs. Rivers for "failure to comply" was without probable cause because Officer Lenard had no legal authority to command her to remain in place while awaiting the victim to appear.

As explained above, this is because there was not a sufficient factual basis for making a <u>Terry</u> stop—the victim's vague description did not cast an objectively reasonable suspicion on Mrs. Rivers sufficient to stop her. If Officer Lenard could not stop her, he could not lawfully order her remain in place. Consequently, because the arrest was illegal, there is no discrete and separate claim for use of excessive force. Any injuries she suffered during the arrest are compensable as an element of the damages she suffered due to the illegal arrest. Of course, if it is found that Officer Lenard is entitled to qualified immunity for the illegal arrest, she can have no separate recovery for the degree of force used making the illegal arrest. Accordingly, the defendant's motion for summary judgment as to the claim for excessive force is due to be granted based upon this legal principle. However, as found above, there exist genuine issues of material fact that preclude entry of summary judgment in favor of the defendant on the plaintiff's claim that she was subjected to an unlawful arrest in violation of the Fourth Amendment.

### B. State-Law Claims and Peace Officer Immunity

Plaintiff also asserts that she was unlawfully arrested and falsely imprisoned in violation of Alabama Code § 6-5-170. (Doc. 23, ¶¶ 37-39). She further alleges that defendant Lenard "committed negligent assault and battery against the Plaintiff when he slammed her to the ground without justification." (Doc. 23, ¶¶ 40-42).

Defendant asserts that the state-law claims are due to be dismissed because defendant is shielded by the statutory immunity granted to peace officers.[17] Plaintiff concedes that her negligent assault-and-battery claim cannot survive the assertion of statutory immunity, but she does contend that she has offered evidence that the defendant acted willfully, fraudulently, or in bad faith in the "takedown," and that he therefore is not entitled to immunity on the state-law claim of false arrest/false imprisonment.

Lenard has asserted that he is entitled to immunity pursuant to Alabama Code § 6-5-338. The statute provides that a police officer of any municipality in the state "shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." Alabama Code § 6-5-338(a). Discretionary functions have been deemed to be "those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take, and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." Moore v. Adams, 754 So. 2d 630, 632 (Ala. 1999), citing Wright

---

[17]    The Second Amended Complaint also includes a claim asserting vicarious liability against the defendant City; however, the plaintiff has agreed "to the dismissal of the City of Homewood altogether" and to the dismissal of her "claim of Respondeat Superior." (Doc. 50, p. 7). Accordingly, the state-law claim against the City need not be addressed, and the motion for summary judgment in favor of the City on Count Six is due to be granted.

v. Wynn, 682 So. 2d 1, 2 (Ala. 1996) and L.S.B. v. Howard, 659 So. 2d 43 (Ala. 1995).

The Alabama Supreme Court has held specifically that the immunity applies to the conduct of officers in making an arrest or attempting to make an arrest, as well as in the execution of a search. See Swann v. City of Hueytown, 920 So. 2d 1075, 1079 (Ala. 2005), Moore, 754 So. 2d at 632 (holding that immunity applied where officers mistakenly searched a house that was not the house described in the warrant). Alabama courts have carved out an exception to the state-agent immunity provided by the Alabama Constitution, however, and have applied the same exception to the availability of the peace officer immunity. Brown v. City of Huntsville, Ala., 608 F.3d 724, 741 (11th Cir. 2010) ("The restatement of State-agent immunity as set out in [Ex parte] Cranman, 792 So.2d at 405, now governs the determination of whether a peace officer is entitled to immunity under § 6–5–338(a).").

Under Alabama law, the "statutory, discretionary-function immunity for law enforcement officers do[es] not apply for acts taken willfully, maliciously, fraudulently, in bad faith, beyond authority, or under a mistaken interpretation of law." Grider v. City of Auburn, Ala., 618 F.3d 1240, 1259 (11th Cir. 2010) (citing Ex parte City of Tuskegee, 932 So. 2d at 904 (Ala. 2005) (discussing

discretionary-function immunity)).  The Alabama Supreme Court established a burden-shifting framework for application of the <u>Cranman</u> exception in which a defendant bears the initial burden of demonstrating that he was acting in a function that would entitle the agent to immunity.  <u>Ex parte Estate of Reynolds</u>, 946 So.2d 450, 452 (Ala.2006).  "If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority."  <u>Id</u>, <u>see also</u> <u>Brown v. City of Huntsville, Ala.</u>, 608 F.3d 724, 741 (11th Cir. 2010).  If a plaintiff can produce sufficient evidence that would allow a jury to find that an officer asserting the immunity acted in bad faith, with malice, beyond his authority, or under a mistaken interpretation of the law, the immunity may be pierced.  <u>Ex parte City of Tuskegee</u>, 932 So. 2d at 908.

In this case, Mrs. Rivers has provided evidence that Lenard physically restrained her in the absence of probable cause to believe she had committed or was committing a crime.  His actions, if a jury found her allegations to be true, would provide evidence that he acted beyond his authority or under a mistaken interpretation of the law in making an investigatory stop and in making the arrest. The plaintiff further has provided evidence that the defendant was told that she was not the person who stole the wallet before he decided to execute the takedown and

handcuff her on the floor of the Wal-Mart.   That evidence supports an inference that he may have acted willfully, maliciously, or in bad faith.   Accordingly, defendant Lenard is not entitled to summary judgment in his favor on the basis that he is entitled to the immunity offered by Alabama Code § 6-5-338.

## CONCLUSION

Based on the foregoing, the motion for summary judgment filed by defendants (doc. 47) is due to be GRANTED IN PART and DENIED IN PART. All claims against the City of Homewood (Counts One through Six as pleaded against the City defendant) are due to be DISMISSED WITH PREJUDICE.

The claims against defendant Lenard alleging an illegal search of the plaintiff's purse (Count One), the use of excessive force under federal law (Count Two), and negligent assault and battery under state law (Count Five), also are due to be DISMISSED WITH PREJUDICE.

The motion for summary judgment is DENIED with respect to the plaintiff's claims against defendant Lenard filed pursuant to Section 1983 challenging the

legality of her detention (Count Three) [18] and her state-law claim of false imprisonment (Count Four), and they remain pending.

A separate order will be entered.

DATED this 28th day of September, 2018.

T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE

---

[18] Count One as pleaded includes a claim that Lenard illegally searched Mrs. Rivers' purse; however, the plaintiff has abandoned the "search" claim asserted in Count One's "search and seizure" claim. The claim as it relates to an illegal arrest or detention remains pending.